## Case No. 7,363.

JOHNS v. SLACK et al.

[2 Hughes, 467.] [1]

District Court, D. West Virginia. Jan., 1875.

James H. Ferguson, William W. Gordon, and Hunter H. Marshall, for complainant.

Samuel Price, N. Goff, Jr., and William H. Hogeman, for defendants.

JACKSON, District Judge. The bill alleges that at a judicial sale made in 1855, in a suit

---

[1] [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission.]

in the circuit court of Kanawha county, in which Isaac Reed, as guardian, was complainant, and Mrs. E. V. Cox and others were defendants, John N. Clarkson became the purchaser of a tract of 122½ acres of land, adjoining the town of Charleston, in the county of Kanawha, for the sum of $15,400. He paid a portion of the purchase-money and executed his notes for the residue. Failing to discharge the notes as they fell due, such proceedings were had in the case as resulted in the appointment of William R. Cox and W. E. G. Gillison as commissioners to resell the property. After this decree was obtained, Clarkson paid four thousand dollars of the unpaid purchase-money, after which no steps were taken to resell the property until 1864. The last order made in the case, prior to the war, was at the fall term, 1859. A short time after, the condition of the country became very unsettled, and hence no move was made to enforce the decree, as we have said, until 1864. At the April term, 1864, of the circuit court of Kanawha county, on motion of William E. G. Gillison, F. A. Lovell was appointed a commissioner, instead of Cox and Gillison, to make the resale of the land under the decree rendered in 1859. Shortly after his appointment, Lovell, as commissioner, advertised the land for sale, and on the 25th of June, 1864, sold the land pursuant to the several orders theretofore made in the case of Reed v. Cox's Heirs [unreported], at which sale Greenberry Slack became the purchaser.

I have briefly given the history of this case, at least what I regard as material, to the time when the present controversy commenced. Upon this state of facts, the plaintiff in this proceeding seeks to set aside the conveyance made to the defendants, by Commissioner Lovell, in pursuance of the order of said court; alleging, first, that the action of Gillison, who held a double relation to the case, that of party in right of his wife, and counsel, was under the circumstances fraudulent. In reply to this position, I have to remark that it was his unquestioned right (if he thought proper) to act as counsel for the protection of his wife's interests, as well as those of her friends. It was a question which he alone could best determine, whether it was prudent for him to maintain that legal relation to the case, and I am not aware of any legal rule that would be violated by such action. Being interested in right of his wife, he had an undoubted right to protect her interests and take such action as in his judgment would best subserve those interests. When, therefore, he thought the time had arrived to take such action, it was not only his legal right to move, but it was clearly his duty to do so. In determining this question, he had to exercise his discretion, the exercise of which is, under the circumstances, the subject of complaint. It does not occur to me, however, that it was improperly exercised in the respects referred to, nor do I perceive that any injury has resulted from his action in this respect. At this point it is sought to connect the confiscation proceedings pending against Clarkson with the action of Gillison, by charging that he took advantage of the absence of both Clarkson and Cox to enforce the decree, pending proceedings of confiscation. The fact that Clarkson and Cox were absent and within the Confederate lines, and that confiscation proceedings had been commenced against them, and that such proceedings "constituted a damaging cloud upon the title of the property," seems to me to be of little or no consequence. At the time of the sale, the proceedings had been pending for some time, and it was evident that there was no serious purpose on the part of the officers of the government to do more than confiscate any personalty Clarkson might have. In fact, this court had announced at a very early period after the passage of the confiscation acts, that in its judgment no estate in fee was liable to confiscation, and that opinion was published and most likely known to all interested parties in this district. But it must be borne in mind that the proceedings in confiscation were against Clarkson, who had only an equitable or contingent interest, and not against the parties who held the legal title to the property in question. Clarkson had no title to it, and could have none until the purchase-money due the estate of Cox was paid and fully discharged. At the time of the sale such was not the fact; on the contrary, the balance due on the original purchase, with the accumulated interest, was about equal to the original debt. Clarkson left the country early in 1861, with a full knowledge of the fact that a decree had been entered in the circuit court of Kanawha county (which had been affirmed by the court of appeals, the court of last resort) directing a resale of the land. This fact was also well known to the people of Charleston, as the property seems to have been the subject of much talk. Every one who took an interest in the property was informed of its situation. In fact, it nowhere appears that there was any effort upon the part of any one to conceal its true condition. Hence, I conclude that the condition of the property was so well understood that the confiscation proceedings pending at the time did not influence Gillison's action, nor does the evidence disclose the fact that he in any way alluded to their pendency or used them for any purpose whatever. Nor does it appear that the pendency of such proceedings seriously affected the sale of the land in controversy. It is also alleged that the decrees should have been modified so as to lay the property off into lots for sale. But this was not done. And the question is asked why Gillison pressed the sale of the property without having first obtained such action before the sale was made. It is sufficient to say that it was not the duty of Gillison or those he represented to ask the court for a modification of the decree in that respect. It had been entered some years before and appealed from by Clarkson to the

court of appeals, and by that court affirmed. The rights of all had been determined, and it was not in the power of either party to modify it. All they could legally and rightfully do was to execute it. Gillison considered the entire tract bound for the debt he represented. They had a lien on the whole tract, and were entitled to have it sold, unless Clarkson, or some one for him, could satisfy the court that a portion of the tract would pay off the balance of the debt; in which event, the court might have so decreed. But it nowhere appears that Clarkson, or any one for him, brought this matter to the attention of the court. If at this stage of the proceedings any one was chargeable with neglect to do what might have been proper under the circumstances, it certainly was not Gillison. In no view of this question as presented, was he bound to take such action. If there was any neglect in regard to this matter, it must be with those whose absence from their homes and the country would more properly account for it. It therefore seems to me that the point attempted to be made by the plaintiff, that "it was a fraud on the part of Gillison to force a sale of the lands of Clarkson at the time and under the circumstances then existing," is not well taken. I am unable to see anything in the conduct of Gillison calculated to prejudice the rights of any one. What he did he clearly had the right to do. He waited until 1864, a period of five years after the final order had been entered, before he took any steps to enforce the decree. It is apparent that he delayed action until peace and tranquillity could be restored to the country. When he did move, the war was substantially over, and the country in this region quiet. But it is evident that the moving consideration with Gillison was to save the debt due Cox's estate. When he moved for the sale, the property had been occupied by both of the contending armies, the fine mansion house had been to a great extent dismantled, the trees, shrubbery, and fences destroyed, and the value of the property supposed to be materially affected. It was at that time abandoned, the house unoccupied, the fields in commons. Its rapid decay consequent upon its abandonment was a most potent reason for his action in the premises. There is no view that I can take of Gillison's conduct that would justify me in sustaining the charge of fraud against him. To sustain this allegation no direct proof has been brought, nor do I think the facts and circumstances of the case warrant the inference of fraud.

The next position of the plaintiff is "that the combination entered into by the purchasers of the land in question, evidenced by a written agreement, and the purchase of the land in pursuance thereof, was, under the circumstances, a fraud on the rights of Clarkson which renders the sale void." An examination of the agreement must satisfy any one that it does not of itself import or constitute a fraud upon the part of those who executed it. The fraud is, therefore, if it exist at all, subsequent to the execution of this instrument, and must have grown out of it. And first, it is contended that the sale is void, whether Lovell, the commissioner, was guilty of any official misconduct in the sale or not. To support this position the proceedings in confiscation are again invoked; this time in connection with B. H. Smith, another of the defendants, instead of Gillison. As I have before remarked, the proceedings in confiscation seem not to have influenced the action of any one, nor does it appear that any one was deterred from bidding by reason of their pendency. It will not be gravely contended that the mere existence of such proceedings amounts to anything, when the purpose of the government was either well known, or it was within the power of any one desiring information on the subject to ascertain her object. The government not only did nothing for two years before the sale of the property (after filing her libel), but, as we have seen, when the property was advertised for sale under the order of the circuit court of Kanawha county, she took no steps to prevent the sale. Under this state of things it must be presumed that she had abandoned her proceedings in confiscation, and subsequent events certainly tend to confirm this view of the case. I therefore conclude that there was nothing in the relation of the government, or its agent, B. H. Smith, to this case, that would authorize this court to conclude that the proceedings in confiscation tended to cast a cloud upon the title, or that there was any such relation to the case on the part of the government, or its officer, as would justify presumption of fraud in fact or in law upon the rights of Clarkson. In this connection, however, it is alleged that independent of the consideration just referred to, the purpose and object of this combination was to perpetrate a fraud upon the rights of Clarkson, and that the parties to this agreement had conspired together to secure that result. To support this position, the evidence of a number of witnesses has been taken by the complainant, as to conversations had with parties to this contract who were members of this combination. In considering this allegation it becomes necessary for the court to examine the evidence in support of, as well as the denials of the defendants to the truth of, the allegation, and the evidence adduced by them in support of their positions. To do this, the court is required to weigh the evidence and to look at it in the same light that a jury would be expected to examine and pass upon it. The motives of the witnesses, their relation to the case, the circumstances by which they are surrounded, and their character for credibility, are all elements to be considered and weighed by the court in making up its judgment.

Having indicated the rules for our guidance in this particular, let us briefly examine

the evidence of George High, James A. Young, and Charles C. Young, to this point. The first witness, High, details a conversation with Whittaker in which he says Whittaker stated that "he had labored hard to get up the company and get all the moneyed men into it so as to have it their own way, whereby there would be no opposition bidding." This conversation occurred after the sale, and conceding the statement to be true, would of itself tend to prove little or nothing; but he is contradicted in toto by Whittaker, and in part by McWhorter. Applying to him the well-known rule of "falsus in uno, falsus in omnibus," I deem it unnecessary at this time to notice his testimony in regard to Atkinson, who is dead, except to say that if what he asserts of him be true, that the members of the company were not to bid against each other, it does not, under the circumstances of this case, amount to anything, for the reason that the evidence discloses the fact that there was but one man in the company of any considerable means, the remaining members being men of moderate means, which of itself is a fact strongly tending not only to discredit his statements, but to establish the fact that the object of the combination was to enable men of small means to bid for the property, which is admitted to be true by John Slack, Sr. James A. Young details a conversation with Atkinson as to the value of the property, stating that Atkinson admitted that they had purchased the property far below its value by getting the moneyed men combined together. Charles C. Young speaks of a conversation with Greenberry Slack, on the morning of the sale, in which he stated that he expected to get the property for less than twenty thousand dollars, and that it was worth one hundred thousand dollars. If these conversations ever occurred, they are nothing more than idle declarations and unsworn statements that are of little or no value when met by the statements of the parties under oath. Both statements are improbable, and, I might say, almost incredible. The conversation with Atkinson took place after the sale, whilst the one with Slack was on the morning of the sale. When Atkinson is said to have spoken the sale was over, and he could have had no motive in making such a statement. The conversation with Slack is a mere expression of opinion as to what the property would sell for. There is no evidence tending to show that the statements in any way affected the value of the property or prevented any one from bidding. It is difficult to perceive what good could be accomplished by such statements, or how Slack or Atkinson could hope to be benefited by them. The evidence clearly shows that neither Slack nor Atkinson were wanting in sense, but, on the contrary, they were both successful business men of limited means. Slack contradicts Young, and is sustained by his co-defendants and many other witnesses, who testify that the property brought its full value. The statements of the two Youngs are, as I have said, very improbable, but, if not, they stand before the court with such a cloud resting upon them as to create doubt in the mind of the court as to the truth of their statements. Whilst Slack, on the one hand, is strongly sustained both by his co-defendants and the facts of the case as they are mainly developed, on the other hand the Youngs, whose statements seem to me so improbable, stand, if not entirely discredited, with their character for truth so assailed and impeached as to render it impossible for the court to credit their statements.

It will be observed that thus far I have examined the evidence relied on by the plaintiff to establish fraud on the part of Gillison and Smith. Passing from the consideration of the questions involved in their action, as well as the facts and circumstances attending the sale, I propose to examine the next position of the plaintiff, "that Lovell, the commissioner who made the sale of the land in question, was guilty of such official misconduct as to render the sale void." This is a very grave charge under any circumstances, but it is particularly so when preferred against a man whose lips are forever sealed by death, and who can have no opportunity to meet it or to explain the transaction upon which it is founded. It is therefore eminently proper that the evidence tending to fix a stain upon the memory of a man whose reputation up to the time of the transaction alluded to was without spot or blemish should be most carefully scrutinized. Therefore, before the mind of the court can be brought to this conclusion, the plaintiff must be required to establish the truth of the allegations by such credible evidence as not to leave its mind in doubt. This allegation of the bill would seem to resolve itself into two propositions. First, that the commissioner was guilty of such misconduct as would have prevented the court (if informed of his conduct) from confirming his action. Second, that he had such an interest in the result of the sale as would disqualify him from acting as such commissioner. I have to some extent examined the conduct of Lovell on the day of sale in connection with Gillison. As we have seen, he was the commissioner of the court, charged with the naked duty of selling the land under the decree. Upon the day of sale he cried the property nearly the entire day, having at noon adjourned over for a short period for dinner. No undue haste was exhibited by him, no improper act on the day of sale is proven against him. True, there is an effort to prove that he did or said something about the title of the property. But this is not clearly proven. On the contrary, if he did anything, he replied to the questions concerning it, that he was acting as commissioner, and that persons desiring information about the title had better inquire of some

lawyer, probably of Colonel Smith. Admit this to be true, and what is there in it? He is selling as commissioner, and sells only such title as is invested in him by the decree of the court. The question asked was not an unusual one at judicial sales, and the reply to it was, in my judgment, not only proper, but quite as usual. But the material fact is, who was deterred by his answer from bidding? What witness has been introduced to show that he would have given more for the property, or would have even bid upon it, except for the conduct of the commissioner?

Upon this most material point the evidence is silent. Much has been said by counsel in their arguments, tending to cast reproach upon the conduct of this commissioner on the day of sale. I confess that in the examination I have given this case, I have been unable, after most diligent labor, to find in the conduct of Lovell on the day of sale, any act that in the least reflects upon his character, or assails his action as commissioner. It is, however, alleged that he was a member of the company who purchased the property, and that he fraudulently concealed his interest, thus defrauding the creditors of Clarkson by selling the land at a sacrifice. And here we have a most pertinent inquiry. What interest does the evidence show that Lovell had? If we look for direct proof on this point, none has been adduced except the evidence of Harvey Young, which is contradicted by John Slack, Sr. The written contract between the purchasers, filed by the defendants, does not disclose it. The deed made by Slack for the benefit of the purchasers does not show it (although made long previous to the institution of this suit). We must, therefore, look to the only other source, and which is mainly relied on to fix the interest of Lovell, viz., his admissions and declarations. To establish this point, the testimony of Harvey H. Young and others is chiefly relied on. It is to be remarked, that nearly all the declarations (except in one of the conversations Lovell had with Young) were made after the sale. They were made when Lovell was not on oath, and when no opportunity was given the defendants for a cross-examination of him to ascertain the truth of his statements. The purchasers acquired their rights to the property immediately after the sale, and some time previous to the date of these declarations. Admissions of this character cannot affect the title of the defendants. The principle is well settled that "admissions made after other persons have acquired separate rights in the same subject-matter, cannot be received to disparage their title, however it may affect that of the declarant himself." The application of this principle might well be relied on to dispose of the declarations of Lovell, and further discussion upon this point rendered unnecessary. But it is not necessary to rely alone upon this principle. If the declarations ascribed to Lovell are true, he must have had some motive for making them. What that motive was immaterial at this point of our discussion. He would then stand before the court as a witness of depraved and corrupt character, having furnished the evidence of his own guilt. The declarations, if true, convict him, as was well remarked, of "perfidy and gross turpitude." If he were living and they were sworn to, they would be disregarded as coming from a source so corrupt as to entitle them to little or no credit. But when they are made, not under the sanction of an oath, and offered as the declarations of a witness who admits his own baseness, they become utterly worthless; and a judge sitting as a chancellor, with the right to draw "all inferences which a jury might draw, and all things which they may lawfully presume will be drawn and presumed by the court," would wholly disregard testimony derived from a person so immoral and corrupt in character, and treat it as unworthy of credit.

It may be conceded, however, for the sake of the argument, that the declarations of Lovell are true, and entitled to consideration by the court in making up its judgment. Admitting to be true all they tend to prove, would the result be different? I think not. Testimony of this character is regarded as the weakest and most unreliable known to the law. It opens the door to fraud, is the most difficult to answer, and is usually resorted to by parties hard pressed to make out a case. In this case the declarations relied on are those of a dead man, and are to be received with the utmost caution. Evidence of this character, unless very strongly supported, is too weak to authorize the court to grant the relief sought for. Here, however, the declarations of Lovell are not only not strongly supported, but they are opposed by the united testimony of all the defendants that have spoken in this cause, who swear positively that at no time was Lovell a member of the company, nor did he at any time have any interest in the property purchased. But suppose Lovell was living, and introduced as a witness by the plaintiff, and admitted that the declarations made to Young and others were true, no one could or would question that the case would be much stronger against the defendants than it now stands. What would then be its condition? Would it not, upon this vital point to the plaintiff, resolve itself into an issue between Lovell claiming an interest in the property on the one hand, and all the defendants on the other denying his interest? Undoubtedly this would be the position of the case on this point. And the court would be required to decide between the testimony of a witness, standing alone, admitting his own turpitude, and the testimony of a number of persons opposed to him, who stand before the court unimpeached, and as far as this court can see, unim-

peachable. Under such circumstances, it will readily be perceived where the weight of evidence would lie. Certainly no one of the counsel for the plaintiff would claim, before a jury, a verdict upon the evidence of Lovell alone, confronted and met by all the defendants in this case. If they did, the answer would simply be, the preponderance of evidence is with the defendants, and the jury would be compelled to find in accordance with the facts. I presume it will not be pretended that the evidence of all the witnesses who prove the declarations of Lovell, makes the case stronger for the plaintiff than he (Lovell) could make it, were he present. If therefore the case upon this point would fail if Lovell were present, admitting all to be true that is here claimed to have been said by him, certainly no one will be bold enough to question the correctness of the conclusion arrived at, founded upon evidence of his admissions and declarations in his absence. The defendants, however, are not driven to rely upon this position alone. They have assailed nearly every important witness introduced by the plaintiff tending to establish Lovell's complicity in the alleged frauds. A number of them admit their subornation in this case and the falsity of their testimony, while others stand in a position calculated to weaken the faith of the court in their statements, if, in fact, they are not so far discredited as to force the court to the conclusion that their evidence should be entirely disregarded.

It is a remarkable fact, running through all the evidence relating to Lovell's declarations as to his interest, that not a witness of unblemished character, with a single exception, has been produced to prove them. The Youngs, and all others introduced for the purpose of proving his interest in the company, are men who belong to a particular class that seem to be present when needed, although many of them live out of the town of Charleston. Another fact is also striking, that Lovell lived here, was known by every one, and yet no one of unquestionable character, unless it be Harvey Young, who is contradicted by John Slack, Sr., and Ruffner, could be found to prove what the Youngs and their contemporaries have testified to. The court is therefore constrained to conclude that the evidence offered by the plaintiff is in a great measure derived from those of questionable character, whilst that of the defendants is from men who stand before the court unimpeached, and I infer unimpeachable, as it appears from the record in this case that both plaintiff and defendants have done all in their power to strengthen and fortify their positions.

Passing from the various questions I have discussed, I propose to consider briefly the object and effect of the combination which it is alleged was formed for the purpose of defeating competition at the sale. That the object was to enable the defendants to bid at the sale and become the purchasers is clearly shown both by the agreement and the evidence. Surely it was a proper one, and has been sanctioned both by usage and law. I am not aware of any principle, either moral or legal, that would be violated by the formation of such an association as the evidence shows this one to be. If such was not the case, then our great industries and enterprises would at once be stayed, and the march of progress in the development of all the great resources of the country would be at an end. In every stage of society this mode has been adopted for the accomplishment of objects of greater or lesser magnitude. I cannot, therefore, see any objection to the formation of this association, nor to its avowed object. If we look to the effect produced by its formation, certainly the evidence does not show that any one was prevented from bidding, nor do we perceive that the property, at the time, sold for less than its value. Whilst the testimony upon this point is conflicting, yet it is clear to my mind that the weight of the evidence in the cause supports this conclusion. It cannot be denied that the evidence is of the most conflicting character. After a careful examination of it, I have reached the conclusion that not only the preponderance but the great weight of the evidence is with the defendants. The allegations of fraud, so much relied on, are not sustained by testimony strong enough to justify the court in granting the relief prayed for. It is wanting in the essential elements that I have already shown it to be deficient in. But when we weigh the testimony offered by the plaintiff with that of the defendants, which is supported and sustained by the answers filed in this case, in which they deny in most explicit and emphatic terms every allegation of fraud, the court cannot escape the conclusion that the plaintiff has failed to sustain his case by that preponderance of testimony which would justify the court in setting aside the deed from Lovell, which is sought to be cancelled and annulled by this proceeding. And I may here remark that courts do not look with much favor upon a proceeding instituted, as this was, so long after the property had been sold, and passed into the hands of other and subsequent purchasers without notice. In this case it seems to me there was unnecessary delay in the institution of this suit. In the view I have taken in this case, I deem it unnecessary to discuss the legal questions arising on the demurrer and presented by the pleas of the defendants. Upon full consideration of this case, I am of opinion that the case is with the defendants, and that the bill be dismissed with costs.